UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FERNANDO DELATORRE, ) | |
| ) | |
| Petitioner, ) | |
| ) | No. 13 C 1355 |
| v. ) | |
| ) | Chief Judge Rubén Castillo |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Respondent. ) | |

## MEMORANDUM OPINION AND ORDER

Fernando Delatorre ("Petitioner") is serving a life sentence for his participation in a racketeering conspiracy and other offenses. In February 2013, he moved to vacate his sentence under 28 U.S.C. § 2255 ("the Petition"). (R. 1, Pet.) This Court denied the Petition. (R. 6, Min. Entry.) He has now filed several documents seeking reconsideration under Federal Rule of Civil Procedure 59(e), as well as motions seeking various other forms of relief. (*See* R. 8, Mem. of Law; R. 9, Mot. for Reconsideration; R. 10, Mot. for Stay; R. 13, Mot. to Rescind; R. 14, Mot. for Transcripts; R. 15, Supplemental Mem. of Law; R. 17, Notice to Ct.) His filings are addressed below.

## BACKGROUND

The facts relating to Petitioner's conviction are set forth in three opinions by the U.S. Court of Appeals for the Seventh Circuit, *see United States v. Morales*, 655 F.3d 608 (7th Cir. 2011); *United States v. Benabe*, 654 F.3d 753 (7th Cir. 2011); *United States v. Benabe*, 436 Fed. App'x 639 (7th Cir. Aug. 18, 2011) (per curiam), and several orders of this Court, *see United States v. Delatorre*, 572 F. Supp. 2d 967 (N.D. Ill. 2008); *United States v. Delatorre*, 522 F. Supp. 2d 1034 (N.D. Ill. 2007); *United States v. Delatorre*, 508 F. Supp. 2d 648 (N.D. Ill. 2007);

*United States v. Delatorre*, 438 F. Supp. 2d 892 (N.D. Ill. 2006). The facts are repeated here only as they pertain to the Petition.

"The Insane Deuces was a street gang engaged in a long-running conspiracy involving deadly violence and drug distribution in northern Illinois." *Benabe*, 654 F.3d at 756. In 2002, state and federal authorities began an intensive investigation into the Insane Deuces after one of its members, Orlando Rivera, agreed to serve as a confidential informant. *Morales*, 655 F.3d at 615. Petitioner was among sixteen men indicted on various racketeering-related charges in connection with the investigation. *Id.* The evidence adduced at trial showed that the Insane Deuce Nation (also referred to as the "Insane Deuces," "Deuces," or the "Nation") was an organized street gang affiliated with the Folks, a national network of local gangs. *Id.* The gang was predominantly made up of Latino/Hispanic males and operated primarily within northern Illinois, though other factions existed throughout Illinois and various state and federal prisons. *Id.* The government's investigation focused on the Aurora Deuces, a chapter with a significant presence in Aurora, Illinois. *Id.* As of 2002, the Aurora Deuces had become bitter rivals of the Latin Kings (also referred to as the "Kings"). *Id.* at 616. This rivalry resulted in "frequent and escalating violence," and often resulted in attacks on innocent persons who were mistakenly believed to be rival gang members. *Id.*

The Insane Deuces had its own set of "leyas," or laws, as well as a detailed hierarchy. *Id.* There were three tiers of membership within the gang: Seniors, Juniors, and Shorties. *Id.* Shorties were the gang's youngest members, and they held the responsibility of carrying out most of the gang's activities, including shootings and other acts of violence, as well as selling drugs to fund the gang. *Id.* Shorties were often juveniles who were recruited to increase the gang's ranks. *Id.* By participating in gang activities, Shorties could work their way up to

becoming Juniors, who were responsible for the gang's day-to-day operations. *Id.* Juniors directed Shorties in their activities, including determining who would participate in particular acts of violence, distributing firearms, and otherwise supervising the Shorties' activities. *Id.* Seniors were "longstanding members of the gang whose age and accomplishments made them the leaders, broad-scope planners, and advisors for the gang." *Id.* Seniors directed Juniors on larger issues, but they were more removed from the gang's day-to-day activities. *Id.*

The gang's daily activities included selling drugs to benefit the gang, carrying out "missions" (attacks on rival gang members), protecting and supporting fellow gang members and their families, punishing gang members who violated the gang's rules, and conducting meetings to further these goals. *Id.* The gang also maintained a "caja" system, which was "a loose form of community property and money acquired for the benefit of gang members." *Id.* For instance, if a gang member was arrested, other members of the gang could take money from the caja to bail him out of jail. *Id.* The caja also included a stash of drugs from which a gang member could borrow to make sales or trades for the benefit of the gang. *Id.* Gang members were also permitted to sell drugs from outside sources, but all sales needed to benefit the gang in some way, usually by paying part of the proceeds into the caja. *Id.* Profits from drug sales were also used to purchase firearms for the gang. *Id.* These guns were used to conduct missions and to protect fellow gang members, and were usually returned to the caja after the mission was completed, unless they were disposed of to avoid ballistics evidence after a murder was committed. *Id.*

Participation in the gang was mandatory for Juniors and Shorties; this included gang members who were "rolled back" from Senior to Junior status in 2002 as part of an effort to better train and lead the gang's growing number of Shorties. *Id.* Every Junior and Shorty

3

member had to pay dues to the caja. *Id.* Missions were assigned to specific gang members, usually Shorties, and primarily consisted of attacks on rival gang members in retaliation for acts of violence or perceived encroachment on the gang's territory. *Id.* at 616-17. Guns were distributed for these missions, and members were directed to empty the entire magazine or suffer punishment for every bullet not fired. *Id.* at 617. In addition to these planned attacks, all members of the gang were required to comply with a "standing order" to attack Latin Kings whenever they had the opportunity to do so. *Id.* Members worked their way up through the gang by participating in missions and other acts of violence, and by donating money or firearms to the caja through drug sales or theft. *Id.* In exchange for their participation, gang members and their families received financial support and physical protection; these benefits applied to gang members on the street as well as gang members incarcerated in correctional facilities. *Id.*

Working with authorities, Rivera surreptitiously recorded several meetings and conversations between Insane Deuces, reported on the gang's activities and plans, and conducted controlled buys of narcotics and firearms from gang members. *Id.* The intelligence gathered through Rivera produced evidence regarding "four murders, eleven attempted murders, two solicitations to commit murder, other shootings, and narcotics distribution incidents—all of which the Deuces perpetrated in 2002 alone." *Id.* In exchange for his cooperation, Rivera was given full immunity and received monetary compensation. *Id.* From information obtained through Rivera, government authorities learned about each of the defendants' roles in the gang. *Id.*

As of 2002, Petitioner held the position of "First Seat Shorty." *Benabe*, 436 Fed. App'x at 644. In that role, "he was responsible for ensuring that the Shorties went out on 'missions'

with guns." *Id.* The Seventh Circuit summarized some of the evidence against Petitioner as follows:

> [I]n a recorded meeting on August 22, 2002, Delatorre confirmed that the gang was involved in the July 18, 2002 shooting of a rival Latin King. He also admitted to being the driver in the [David] Lazcano murder, giving specific details, including the car he drove and the type of gun used. The jury heard a recorded conversation between Rivera and Delatorre on October 19, 2002, when the two met to dispose of two firearms. Delatorre told Rivera in the recording that he and other Insane Deuces killed David Morales on October 16, 2002. Law enforcement recovered the firearms. Ballistics evidence matched one gun to the Morales murder and the other to two shootings—a September 19, 2002 attempted murder in which a bystander was shot in the back, and a September 28, 2002 attempted murder in which another bystander, a 14-year-old boy, was shot in the back and paralyzed.

*Benabe*, 654 F.3d at 759. After his arrest in January 2003, Petitioner confessed to his involvement in the murders of Lazcano, Morales, and a third individual. *Benabe*, 436 Fed. App'x at 644.

In 2006, Petitioner and fifteen other Insane Deuces were indicted on charges of racketeering conspiracy; assault with a dangerous weapon, murder, attempted murder, and conspiracy to commit murder in aid of racketeering activities; illegal possession of firearms; distribution and possession of narcotics; and conspiracy to distribute narcotics. *Morales*, 655 F.3d at 618. One of the sixteen pleaded guilty and another remained a fugitive. *Id.* Given the logistical challenges of trying the remaining fourteen defendants in a single courtroom, the Court severed the case into two trials. *Id.* Petitioner was grouped with the leaders of the gang, who proceeded to trial first. *Benabe*, 654 F.3d at 756.

The trial of the first group began in February 2008, and ended in late April 2008. *Id.* at 757. Over this period, the jury heard extensive evidence of gang members' participation in murders, attempted murders, and shootings through the testimony of eyewitnesses and cooperating witnesses, recorded co-conspirator statements, and ballistics evidence. *Id.* Five

5

former gang members testified on behalf of the government, "describing for the jury the gang's structure, leadership, and membership, its rules and regulations, and providing horrific details of the murders and attempted murders committed by the Insane Deuces." *Id.*

At the close of the evidence, Petitioner and all but one of his co-defendants were convicted of engaging in a racketeering conspiracy.[1] *Id.* Petitioner (joined by certain co-defendants on various counts) was also convicted of murder in aid of racketeering activity, conspiracy to distribute a controlled substance, assault with a dangerous weapon in aid of racketeering activity, distribution of crack cocaine, and possession of a firearm with an obliterated serial number. *Id.* A second phase of the trial was then conducted, wherein the jury returned special verdicts as to each defendant assigning responsibility for four murders that were charged in the indictment. *Id.* The jury also returned a finding with respect to Petitioner and one of his co-defendants requiring that they forfeit a total of eighteen firearms. *Id.* For his role in the conspiracy, Petitioner was sentenced to life in prison. *Id.*

The defendants appealed. *Id.* at 757-58. Petitioner joined with several of his co-defendants in raising the following arguments: the Court erred in (1) empanelling an anonymous jury; (2) excluding Petitioner and one of his co-defendants from the courtroom during trial; (3) instructing the jury; (4) providing the jury with partial transcripts during their deliberations; (5) handling allegations of juror misconduct; and (6) making certain evidentiary rulings. *Id.* at 758; *Benabe*, 436 Fed. App'x at 650-52. In two lengthy opinions, the Seventh Circuit rejected each of these arguments and affirmed Petitioner's conviction and sentence in all respects. *Benabe*, 654 F.3d at 758-82; *Benabe*, 436 Fed. App'x at 645-62. Petitioner filed a petition for writ of

---

[1] The jury could not reach a verdict as to defendant Harold Crowder. *Benabe*, 654 F.3d at 757 n.1. He was later retried with the second group of defendants and convicted on all charges. *See Morales*, 655 F.3d at 615.

6

certiorari with the U.S. Supreme Court, but his petition was denied on February 21, 2012. (R. 1, Pet. at 3.)

On February 6, 2013, Petitioner tendered his federal Petition for mailing to this Court. (*Id.* at 8.) He alleges that: (1) he received ineffective assistance of counsel; (2) the prosecutor engaged in misconduct by failing to "make good" on his "offer/promise/assurance of [a] 25-30 year plea"; (3) Petitioner's sentence violates the Eighth Amendment's prohibition on cruel and unusual punishment; and (4) his speedy trial rights were violated because he was not brought to trial in a timely manner. (*Id.* at 4-6.) This Court previously denied the Petition. (R. 6, Min. Entry.) Petitioner now seeks reconsideration of that ruling. (*See* R. 9, Mot. for Reconsideration.) He separately moves for the appointment of counsel, the production of records, and other forms of relief. (R. 10, Mot. for Stay; R. 12, Mot. for Counsel; R. 13, Mot. to Rescind; R. 14, Mot. for Transcripts.)

## LEGAL STANDARD

Under 28 U.S.C. § 2255, a prisoner can seek to vacate his sentence on "the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255. "Relief under this statute is available only in extraordinary situations, such as an error of constitutional or jurisdictional magnitude or where a fundamental defect has occurred which results in a complete miscarriage of justice." *Blake v. United States*, 723 F.3d 870, 878-79 (7th Cir. 2013).

Under Rule 59(e), a party may move to alter or amend a judgment within 28 days. Fed. R. Civ. P. 59(e). Motions under Rule 59(e) are granted only in rare circumstances. *Bank of*

7

*Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990). "A Rule 59(e) motion will be successful only where the movant clearly establishes: '(1) that the court committed a manifest error of law or fact, or (2) that newly discovered evidence precluded entry of judgment.'" *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 954 (7th Cir. 2013) (citation omitted). A manifest error of law under Rule 59(e) means the "wholesale disregard, misapplication, or failure to recognize controlling precedent." *Anderson v. Catholic Bishop of Chicago*, 759 F.3d 645, 653 (7th Cir. 2014) (citation omitted). It is improper to use a Rule 59(e) motion "to advance arguments or theories that could and should have been made before the district court rendered a judgment." *Sigsworth v. City of Aurora, Ill.*, 487 F.3d 506, 512 (7th Cir. 2007) (citation omitted). Nor is it proper for the movant to simply reassert previously rejected arguments. *Vesely v. Armslist L.L.C.*, 762 F.3d 661, 666 (7th Cir. 2014).

## ANALYSIS

### I. The Petition

#### A. Ineffective Assistance of Counsel

In his first claim, Petitioner alleges that he received ineffective assistance from attorney Fred Morelli, who represented him prior to trial. (R. 1, Pet. at 4-5; R. 8, Mem. of Law at 5-8; R. 18, Supplemental Mem. of Law at 9-27.) Under the Sixth Amendment, a criminal defendant is entitled to "effective assistance of counsel—that is, representation that does not 'fall below an

objective standard of reasonableness' in light of 'prevailing professional norms.'"[2] *Bobby v. Van Hook*, 558 U.S. 4, 16 (2009) (quoting *Strickland v. Washington*, 466 U.S. 668, 686 (1984)). To prevail on such a claim, the petitioner must show: (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced him. *Strickland*, 466 U.S. at 684-85.

On the deficiency prong, the central question is "whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Strickland*, 466 U.S. at 690). In other words, "counsel need not be perfect, indeed not even very good, to be constitutionally adequate." *McAfee v. Thurmer*, 589 F.3d 353, 355-56 (7th Cir. 2009) (citation omitted); *see also Harrington*, 562 U.S. at 110 ("there is no expectation that competent counsel will be a flawless strategist or tactician"); *Sussman v. Jenkins*, 636 F.3d 329, 351 (7th Cir. 2011) ("[T]he question is not whether the lawyer's work was error-free, or the best possible approach, or even an average one, but whether the defendant had the 'counsel' of which the sixth amendment speaks." (citation omitted)). Counsel is also given significant discretion in selecting a strategy based on the information known to him at the time. *See Yu Tian Li v. United States*, 648 F.3d 524, 528 (7th Cir. 2011) ("The defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."); *United States v. Lathrop*, 634 F.3d 931, 938 (7th Cir. 2011) (if counsel's decisions were not "so

---

[2] The Sixth Amendment right to counsel attaches upon "the initiation of adversary judicial criminal proceedings." *Thompkins v. Pfister*, 698 F.3d 976, 984 (7th Cir. 2012) (citation omitted). "[A] criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel." *United States v. States*, 652 F.3d 734, 741 (7th Cir. 2011) (quoting *Rothgery v. Gillespie Cty.*, 554 U.S. 191, 213 (2008)). That occurred in this case on January 31, 2003, when Petitioner first appeared before Magistrate Judge Martin C. Ashman for an initial hearing. (*See United States v. Delatorre*, No. 03-CR-90, R. 5, Min. Order.)

9

far off the wall that we can refuse the usual deference that we give tactical decisions by counsel, his performance will not qualify as deficient"). On collateral review, the Court's review of counsel's performance is doubly deferential: "[T]he question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105. In considering that question, the Court must avoid employing the benefit of hindsight, and must respect its "limited role in determining whether there was manifest deficiency in light of information then available to counsel." *Premo v. Moore*, 562 U.S. 115, 125 (2011).

On the prejudice prong, the petitioner must establish a reasonable probability that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is one that is "sufficient to undermine confidence in the outcome." *Id.* In assessing prejudice under *Strickland*, "the question is not whether the Court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Harrington*, 562 U.S. at 111. "The likelihood of a different result must be substantial, not just conceivable." *Id.* at 112.

Here, Petitioner claims that he received ineffective assistance from Morelli during pretrial proceedings. (R. 1, Pet. at 5; R. 8, Mem. of Law at 2-8.) The record reflects that a criminal complaint was filed against Petitioner on January 28, 2003, charging him with federal controlled substance and firearms violations. (*United States v. Delatorre, et al.*, No. 03-CR-90, R. 1, Compl.) He was arrested on January 31, 2003, and went before a Magistrate Judge for an initial appearance that same day. (*Id.*, R. 5, Min. Order.) He was ordered to remain in custody pending further court proceedings. (*Id.*) Morelli filed an appearance as retained counsel on February 5,

10

2003. (*Id.*, R. 7, Appearance.) That same day, Petitioner appeared again before the Magistrate Judge, and waived his right to a detention hearing and preliminary examination. (*Id.*, R. 6, Min. Order.) During the ensuing months, Petitioner participated in multiple debriefing sessions with government agents and appeared twice before a grand jury to testify about the Insane Deuces. (R. 1, Pet. at 11-15.)

Ultimately, Petitioner decided to stop cooperating with the government, and in September 2004, he refused to appear before the grand jury to complete his testimony. (*Id.* at 14-15.) On September 30, 2004, Morelli was granted leave to withdraw from the case. (*Delatorre*, R. 9, Min. Order.) The following month, a grand jury indicted Petitioner on controlled substance and weapons charges. (*Id.*, R. 10, Indictment.) A number of other Insane Deuces were then arrested and indicted during the following year; they, along with Petitioner, were ultimately charged in a fifteen-count indictment with racketeering conspiracy and related offenses. (*See id.*, R. 227, Second Superseding Indictment.) Petitioner was represented by two appointed attorneys, William Huyck and Richard Kling, during the remainder of the case. (*Id.*, R. 15, Min. Order; R. 170, Min. Entry)

Petitioner's ineffective assistance claim focuses solely on Morelli; he argues that Morelli should have done more to obtain a plea agreement for him while he was cooperating with the government. (R. 1, Pet. at 5.) The Sixth Amendment right to counsel "extends to the plea-bargaining process." *Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2012). Such claims are governed by the same two-part test articulated in *Strickland*. *Missouri v. Frye*, 132 S. Ct. 1399, 1405 (2012). On the performance prong, the defendant must show that counsel's representation in connection with the plea process fell below an objective standard of reasonableness. *Lafler*, 132 S. Ct. 1384 (quoting *Hill v. Lockhart*, 474 U.S. 52, 57 (1985)). To establish prejudice, the

11

defendant must show that "the outcome of the plea process would have been different with competent advice." *Id.*

Petitioner does not assert that counsel misadvised him in connection with a plea that was actually offered by the government, or that counsel failed to advise him that the government had made a formal plea offer. His reliance on the Supreme Court's opinions in *Frye* and *Lafler* is therefore misplaced. *See Frye*, 132 S. Ct. 1405 (defense counsel was ineffective in failing to communicate to the defendant that the government had offered him a formal plea); *Lafler*, 132 S. Ct. at 1384 (defense counsel was ineffective in advising the defendant to reject a highly favorable plea agreement and proceed to trial). Instead, Petitioner's claim is that Morelli should have forced the prosecutor to offer him a formal plea agreement while he was cooperating in the government's investigation. (R. 1, Pet. at 5, 9-16; R. 8, Mem. of Law at 4-8.) While this might have been Petitioner's preferred course, there is nothing in the record to suggest that counsel had the ability to force the government to offer Petitioner a plea agreement.

By Petitioner's own account, the prosecutor made it very clear that he expected Petitioner's full cooperation in the government's ongoing investigation, and *then* they would

discuss the specifics of a plea agreement.³ (*See* R. 1, Pet. at 12-14.) In the prosecutor's view, the government held "all the cards." (*Id.* at 13.) The prosecutor's view was not unreasonable: at that point the government had in its possession undercover recordings of Petitioner talking to Rivera about his involvement in several murders. (*Id.* at 36.) Petitioner had also made incriminating statements to law enforcement agents after his arrest regarding his involvement in three murders. *Benabe*, 436 Fed. App'x at 644. Petitioner acknowledges that he made these incriminating statements before Morelli was retained. (*See* R. 1, Pet. at 9.)

Thus, when Morelli took over the case, Petitioner's options were rather limited. The government advised Morelli that the U.S. Attorney and/or the Kane County State's Attorney would likely be charging Petitioner with some or all of the murders he had described on the recordings. (R. 1, Pet. at 34-35.) In Morelli's view, the government also had enough evidence to pursue charges against the other Insane Deuces without any assistance from Petitioner. (*Id.* at 36.) Under these circumstances, Morelli urged Petitioner to cooperate with the government, believing it was in his best interest to do so. (*Id.* at 36-38.) In Morelli's view, the only reason Petitioner was getting any consideration from the government was that he was "among the first

---

³ By Petitioner's account, the prosecutor stated that it was his intention to develop a "global" plea agreement for Petitioner at the end of the government's investigation, which would encompass all of Petitioner's state and federal crimes. (R. 1, Pet. at 13.) The prosecutor also told him that any such agreement would require Petitioner to serve 25 to 30 years in prison. (*Id.*) Petitioner submits affidavits from several family members who attest that Petitioner told them back in 2004 that he intended to accept a 25 to 30 year plea deal "as soon as it was presented to him." (*See* R. 1, Pet. at 44; *see also* R. 1, Pet. at 43, 45-46.) These affidavits are of little probative value in establishing what the prosecutor actually said to Petitioner. *See Paters v. United States*, 159 F.3d 1043, 1047 n.5 (7th Cir. 1998) (affidavits from family members did not establish that petitioner had received a plea offer and seriously considered it in connection with his claim of ineffective assistance of counsel at the plea bargain stage, where the affidavits were not based on personal knowledge and instead "merely relate[d] naked allegations of [the petitioner] himself"). In any event, the affidavits do not contradict Petitioner's account that the prosecutor did not actually offer him a plea, and instead merely expressed an intention to do so at a later stage if Petitioner fully cooperated. (*See* R. 1, Pet. at 12-14, 19.)

13

[of the Insane Deuces] to debrief." (*Id.* at 36.) Morelli was especially concerned that Petitioner's offenses made him eligible for the death penalty. (*Id.*) He was in fact correct: the government later gave significant consideration to seeking the death penalty against Petitioner in this case. *See United States v. Delatorre*, 438 F. Supp. 2d 892 (N.D. Ill. 2006).

To the extent Petitioner is arguing that Morelli allowed the prosecutor to breach an immunity agreement, (*see* R. 15, Supplemental Mem. of Law at 6-8), the record does not bear out an argument that Petitioner was ever granted immunity. Instead the record reflects that the prosecutor agreed not to use any of the specific information Petitioner provided during the proffer sessions in its case in chief against Petitioner or in aggravation of his sentence; however, the government reserved the right to pursue any and all investigative leads derived from Petitioner's statements and to freely use any additional evidence it obtained as a result of those leads. (*See* R. 1, Pet. at 32.) If Petitioner testified falsely or "otherwise present[ed] a position inconsistent with the proffer," the government was free to use the information Petitioner had provided for any purpose. (*Id.*) Petitioner stated on the record during his grand jury testimony that he understood these terms. (*Id.*) The terms were also outlined in a letter from the prosecutor which both Petitioner and Morelli signed. (*Id.* at 34-5.) Morelli repeatedly advised Petitioner that, given the terms he had agreed to, once he started down the road of cooperating with the government "there would be no turning back." (*Id.* at 38.)

In light of the record, there is no basis to conclude that counsel's advice to Petitioner was "so far off the wall" as to amount to deficient performance. *See Lathrop*, 634 F.3d at 938. Instead, his advice appears to have been sound given the damaging evidence the government had in its possession. Nor has Petitioner made the requisite showing of prejudice. To establish prejudice in connection with a claim of ineffective assistance at the plea bargain stage, Petitioner

14

must demonstrate a reasonable probability that a plea would have been accepted by the government and approved by the court if not for counsel's deficient performance. *See Lafler*, 132 S. Ct. at 1385. As outlined above, the prosecutor flatly refused to discuss a plea agreement with Petitioner until he provided all the information that was requested of him; Petitioner ultimately stopped cooperating in the government's investigation and refused to complete his grand jury testimony, so that point was never reached. (*See* R. 1, Pet. at 14-15.) There is nothing in the record to suggest that if Morelli had acted differently, the prosecutor would have offered Petitioner a plea even though he stopped cooperating in the government's investigation. Based on the record, the Court cannot conclude that Petitioner received ineffective assistance from Morelli. The Court finds no basis to alter or amend the judgment with respect to claim one.

### B. Prosecutorial Misconduct

In his second claim, which is related to the first, Petitioner suggests that the prosecutor violated *Santobello v. New York*, 404 U.S. 257 (1971), by reneging on his promise to provide Petitioner with a plea agreement. (R. 1, Pet. at 5; R. 15, Supplemental Mem. of Law at 5-8.) In *Santobello*, the Supreme Court held that a defendant's rights were violated when the prosecutor reneged on a promise to recommend a specific sentence, because the defendant pleaded guilty in reliance on that promise. *Santobello*, 404 U.S. at 262-63. That case is inapplicable here, because Petitioner did not plead guilty. Instead, he stopped cooperating with the government nearly four years before the trial began. (*See* R. 1, Pet. at 14-15.) After he stopped cooperating, his two appointed attorneys vigorously defended the charges, including challenging the admission of his pretrial statements to law enforcement agents. (*Delatorre*, R. 152, Mot. to Suppress.) Acting on his own, Petitioner later raised a defense that the government had no jurisdiction over him because he is a "sovereign citizen." (*See, e.g.*, R. 612, Aff.; R. 613, Notice; R. 640, Aff.; R. 641,

Demand.) Petitioner's actions delayed the proceedings and ultimately led to his exclusion from the courtroom during trial.[4] *See Benabe*, 654 F.3d at 770-71. Petitioner then proceeded to trial and was convicted by a jury on multiple charges. *Id.* at 757. Petitioner's case is thus nothing like *Santobello*, wherein the defendant forfeited his trial rights and entered a guilty plea in reliance on a promise made by the government.

Nor is there any evidence of a broken promise by the government. As outlined above in connection with claim one, the prosecutor did not specifically promise Petitioner anything. Instead, the prosecutor told him in very clear terms that he needed to continue cooperating in the government's investigation before any written plea deal could be arranged. (R. 1, Pet. at 12-14.) By Petitioner's own account, the prosecutor never actually offered him a plea agreement, but merely "promised to offer [a plea] at the conclusion of the proffer sessions." (*Id.* at 19.) That never happened because Petitioner stopped cooperating. (*Id.* at 14-15.) Petitioner apparently wanted to force the government to offer him a plea agreement anyway, but for the reasons explained above, he was in no position to do so. The Court finds no merit to Petitioner's prosecutorial misconduct claim, and no basis to alter or amend the judgment in connection with this claim.

### C.     Remaining Claims

In his remaining claims, Petitioner alleges that his sentence is unduly long in violation of the Eighth Amendment, and that his Sixth Amendment speedy trial rights were violated because he was not indicted and brought to trial in a timely manner. (R. 1, Pet. at 5-6; R. 15, Supplemental Mem. of Law at 17-18.) These claims are procedurally defaulted, however,

---

[4] The Seventh Circuit found Delatorre's exclusion from the courtroom proper, concluding that he had conducted himself in "a manner so disorderly, disruptive, and disrespectful of the court that his trial [could not] be carried on with him in the courtroom." *Benabe*, 654 F.3d at 770-71 (citing *Illinois v. Allen*, 397 U.S. 337, 343 (1970)).

because they could have been raised on direct appeal but were not.[5] *Sandoval v. United States*, 574 F.3d 847, 850 (7th Cir. 2009) ("claims cannot be raised for the first time in a § 2255 motion if they could have been raised at trial or on direct appeal"); *United States v. Barger*, 178 F.3d 844, 848 (7th Cir. 1999) ("[A] § 2255 motion is not to be used as a substitute for a direct appeal."); *see also United States v. Robinson*, 8 F.3d 398, 406 n.10 (7th Cir. 1993) (Speedy Trial claim could have been raised on direct appeal and was thus procedurally defaulted in Section 2255 proceeding); *Williams v. United States*, 805 F.2d 1301, 1308-09 (7th Cir. 1986) (Section 2255 petitioner waived his Eighth Amendment challenge by failing to raise it on direct appeal).

Defaulted claims can only be reviewed on the merits if a petitioner establishes cause and prejudice for his default, or establishes that he is actually innocent. *See Bousley v. United States*, 523 U.S. 614, 622 (1998). Petitioner argues in general terms that ineffective assistance of counsel excuses his default. (R. 15, Supplemental Mem. of Law at 9.) He is correct that attorney error amounting to ineffective assistance of counsel can provide cause for setting aside a procedural default. *See Smith v. Gaetz*, 565 F.3d 346, 352 (7th Cir. 2009.) However, all of Petitioner's filings focus on errors made by Morelli, who represented Petitioner for a brief period prior to trial. Petitioner does not attempt to show that his *appellate counsel* was ineffective in failing to raise these two claims on direct appeal, which is where the default occurred. Accordingly, he has not established cause and prejudice for his default. Nor has he attempted to argue actual innocence, and reasonably so. Such an argument would be frivolous in light of the extensive evidence of Petitioner's guilt, including his own recorded statements and admissions to

---

[5] By contrast, ineffective assistance of counsel claims are not subject to this rule and may be raised for the first time in a proceeding under Section 2255. *See Massaro v. United States*, 538 U.S. 500 (2003). Section 2255 is the proper vehicle for raising a claim that the government breached a promise made during plea negotiations. *See Bischel v. United States*, 32 F.3d 259, 264 (7th Cir. 1994).

17

law enforcement agents. *See Benabe*, 654 F.3d at 759; *Benabe*, 436 Fed. App'x at 644. Therefore, the Court finds no basis to alter or amend the judgment with respect to either of these two claims.

## II. Petitioner's Motions

In addition to seeking reconsideration on the merits, Petitioner has filed other motions seeking various forms of relief. (R. 10, Mot. for Stay; R. 12, Mot. for Counsel; R. 13, Mot. to Rescind; R. 14, Mot. for Transcripts.) The Court addresses first his motion for appointment of counsel. (R. 12, Mot. for Counsel.) Unlike a criminal defendant, an indigent litigant does not have a right to counsel at public expense in a civil proceeding. *See Resendez v. Knight*, 653 F.3d 445, 446 (7th Cir. 2011) ("It is . . . well established that a criminal defendant enjoys [a] right to counsel through his first appeal . . . but that, once the direct appeal has been decided, the right to counsel no longer applies." (citation omitted)); *Jackson v. Cnty. of McLean*, 953 F.2d 1070, 1071 (7th Cir. 1992) ("indigent civil litigants have no constitutional or statutory right to be represented by counsel in federal court"). Nevertheless, the Court has discretion to appoint counsel for a person seeking relief under Section 2255 if the circumstances warrant it. 18 U.S.C. § 3006A(a)(2)(B). The Court will abuse its discretion in declining to appoint counsel only "if, given the difficulty of the case and the litigant's ability, [the petitioner] could not obtain justice without an attorney, he could not obtain a lawyer on his own, and he would have had a reasonable chance of winning with a lawyer at his side." *Winsett v. Washington*, 130 F.3d 269, 281 (7th Cir. 1997) (citation and internal alterations omitted).

Petitioner's motion is less than one page long, and he does not clearly explain why he needs counsel, other than to suggest that he needs help obtaining additional portions of the pretrial record. (*See* R. 12, Mot. for Counsel.) His separate request for records is addressed

below, but regarding his request for counsel, the Court does not find the *Winsett* standard to be met in this case. Regarding Petitioner's abilities, it is apparent that he is fully literate and well-versed in the facts and legal principles underlying his conviction. His filings are fully comprehensible, cite to relevant case law, and contain cogent arguments in support of his request for relief. The Court has given all of his filings liberal construction, but his claims simply fail under the applicable law or are procedurally defaulted. In light of the record, there is no basis to conclude that Petitioner cannot obtain justice without an attorney, or that he would have a "reasonable chance of winning with a lawyer at his side." *Winsett*, 130 F.3d at 281. Therefore, the Court declines to appoint counsel.

Petitioner separately requests production of "all pretrial transcripts with respect to Case 03-CR-9-1." (R. 14, Mot. for Transcripts.) This motion is also quite brief and does not clearly identify what transcripts he is seeking. There are countless volumes of transcripts already included in the record, including transcripts from various pretrial proceedings. (*See, e.g.*, R. 139, 140, 173, 247, 276, 488.) Although unclear, Petitioner may be seeking the production of additional transcripts to substantiate his allegations about statements made by the prosecutor while he was cooperating with the government. (*See* R. 14, Mot. for Transcripts at 1.) Such records are unnecessary. The Court has fully credited Petitioner's account of what occurred, but for the reasons explained above, the facts he has alleged do not establish ineffective assistance of counsel or prosecutorial misconduct. Accordingly, his motion will be denied.

Petitioner also filed a motion asking the Court to delay ruling on his motion to reconsider for a period of 90 days so that he could look for counsel on his own. (R. 10, Mot. for Stay.) He later changed his mind, however, and now moves to rescind the request for a stay. (R. 13, Mot.

to Rescind.) The motion to rescind will be granted, and the motion for a stay will be denied as moot.

Finally, within one of his filings, Petitioner requests an evidentiary hearing on his Petition. (*See* R. 15, Supplemental Mem. of Law at 10-19.) The Court need not hold a hearing under Section 2255 when the petition "and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see also Sandoval*, 574 F.3d at 850 (petitioner is entitled to a hearing in a Section 2255 case only if he has alleged facts that, if proven, would entitle him to relief). For the reasons fully outlined above, that standard is met here. Even accepting all of Petitioner's allegations as true, he has failed to establish ineffective assistance of counsel or prosecutorial misconduct, and his remaining two claims cannot be reached on the merits. Therefore, his request will be denied.

## CONCLUSION

For the foregoing reasons, the Petitioner's motion to reconsider (R. 9), motion for appointment of counsel (R. 12), motion for transcripts (R. 14), and request for an evidentiary hearing (R. 15) are DENIED. Petitioner's motion to rescind his request for a 90-day stay (R. 13) is GRANTED, and his motion for a stay (R. 10) is DENIED as moot.

ENTERED: _____
Chief Judge Rubén Castillo
United States District Court

**Dated: March 11, 2015**

20